**UNITED STATES of America,
Plaintiff,**

v.

**Joseph F. SCHIPANI, Defendant.**

**No. 63–CR–237.**

United States District Court
E. D. New York.

Nov. 8, 1968.

Joseph P. Hoey, U. S. Atty., for the Eastern District of New York, Brooklyn, N. Y., for plaintiff; Eldon F. Hawley, Cono R. Namorato, Trial Attys., Dept. of Justice, Tax Division, Washington, D. C., of counsel.

Jacob P. Lefkowitz, New York City, for defendant.

## OPINION

WEINSTEIN, District Judge.

## I. DIFFERENCES BETWEEN FIRST AND SECOND TRIAL

This net worth tax fraud case covering the years 1956 through 1960 was tried before the Court essentially on the record of the first trial. The factual background is set out in the affirming opinion of the Court of Appeals. United States v. Schipani, 362 F.2d 825 (2d Cir. 1966). See also United States v. Schipani, 289 F.Supp. 43 (E.D.N.Y. 1968), 44 F.R.D. 461 (E.D.N.Y.1968).

There are two major differences between this and the first trial. The government must now succeed by negating all non-taxable sources of income rather than by establishing particular sources. Evidence introduced at the ear-lier trial relating to possible sources of income has been suppressed. See United States v. Schipani, 289 F.Supp. 43 (E.D. N.Y.1968).

The second difference is the inapplicability of the "presumption", relied upon by the government at the first trial, that the defendant, since he filed on tax return during the pre-indictment years, earned less than the minimum sum required for a tax return—five or six hundred dollars a year. Since he spent considerably more than these amounts, the government argued that he could not have accumulated any net worth during this period. Such an inference is inconsistent with the factual pattern described below. It would beat the defendant's shield of the presumption of innocence into a sword for the government. The Court of Appeals frowned on this approach; the government may not use it. United States v. Schipani, 362 F.2d 825, 829–830 (2d Cir. 1966).

## II. AVAILABILITY OF CASH HOARD

The critical factual question in the case is whether the defendant had acquired a cash hoard prior to the indictment period on which he might have lived during the indictment years. The Court concludes beyond a reasonable doubt that there was no such cash hoard.

In arriving at this conclusion, the following factors have been considered:

1. The government's thorough investigation which failed to uncover any traces of a prior accumulation.

2. The proven expenditures made by the defendant during the period 1943 through 1955 together with the inference that the defendant must have made additional expenditures for living expenses for himself and his family.

3. A series of events which corroborate the fact that the defendant had not accumulated any cash reserve:

(a) The defendant stated in 1943 in connection with an inquiry of prison

authorities that he had assets of only $1,350.

(b) The defendant negotiated two loans during 1944 in the amount of $205.00. Such small loans are inconsistent with the existence of a cash accumulation. Undoubtedly, the defendant's $1,350 hoard had been depleted by his family's needs, requiring him to borrow small amounts to meet living expenses.

(c) In 1940, the defendant borrowed $51.59 from a life insurance company to pay a premium. The defendant made two small payments on the loan in 1942 and 1943, but did not repay the loan in full until 1947, when he made a final payment of $55.10. This event suggests that the defendant was in a precarious financial position from 1940 to at least 1947. The premium involved was relatively small yet the defendant could only make partial payments in 1942 and 1943, and did not complete the payment until approximately seven years after the premium was originally due.

(d) The defendant was delinquent in the payment of numerous premiums on his insurance policies. On many occasions it was necessary for the defendant to apply for reinstatement of a policy which was "out of benefit" because the defendant was more than thirty days late in the payment of a premium. In connection with three of his policies, the defendant was more than thirty days late in the payment of eighteen annual premiums, and he had to make repeated applications for reinstatement.

In addition to life insurance policies, the defendant also contracted for insurance on his boat and even arranged for fire insurance on the household effects of his son. He was obviously a firm believer in the benefits of all types of insurance coverage. An individual as intelligent as the defendant would not repeatedly fail to make premium payments within the thirty day grace period if he had an available cash accumulation. The amounts due were minimal,

yet the premiums were repeatedly late, necessitating applications for reinstatement. Each application for reinstatement commenced the running of a new two year "period of contestability." It is unlikely that anyone with a cash accumulation would voluntarily allow the grace period to lapse, thereby giving the insurance company an additional period within which it could contest a policy.

(e) In 1955, the defendant financed the purchase of a new car. He was often delinquent in the payment of monthly installments in 1955 and 1956, and, on at least two occasions, a late penalty was collected from him.

(f) In 1955, a default judgment in the amount of $64.05 was entered in an action brought by a health club against the defendant's wife to recover the sum of $46.00. The defendant subsequently paid $55.00 to an attorney in settlement of this judgment.

(g) The defendant made arrangements early in 1956 to mortgage his house in Long Beach, New York. The transaction was concluded in May, 1956, when the defendant received $10,000.00, less mortgage expenses. Defendant made arrangements to have the check which he received cashed immediately. He was delinquent in making several mortgage payments, and in 1957 he paid some $20.00 in late charges.

(h) In November, 1956, the defendant partially financed the purchase of a 1957 car. On one occasion, there was a delinquency in repaying this loan.

(i) In 1958, the defendant financed the purchase of jalousies and a boat.

A review of these events (3(a)–(i)) shows that the defendant repeatedly found difficulty in meeting his financial obligations. The conclusion is inescapable that the defendant had not accumulated a cash reserve during the pre-indictment period.

Many of defendant's transactions required installment payments. Since he had no checking account, each installment required the delivery of cash or an appearance at a bank to purchase a

money order. If the defendant had had a cash accumulation it is unlikely that he would have chosen such inconvenient installment plans.

The exhaustive investigation conducted by the Treasury agents disclosed no visible assets other than those for which the defendant was given credit. If he had had other resources it seems unlikely that he would have hoarded them in the form of cash. Such an unproductive use of his funds seems inconsistent with his life style, his intelligence, the needs of his family and his abilities as revealed by the evidence. It is highly probable that had he had a sizeable cash hoard he would have invested it to get a return in the form of interest, dividends, rentals, or other profits. No such investments were found despite an extensive search. If they existed, the income from them would have been sufficient to support the indictment.

Defendant's spending habits do not appear to be those of a retired person living on a prior accumulation. Rather, they appear to be the expenditures of a capable and aggressive person, confident that he could earn a living at his chosen field—whatever it was. His surreptitious method of using many small money orders rather than a checking account or substantial cash payments is inconsistent with the action of a citizen with a substantial nest egg of cash. It is reasonable to infer that this defendant met such current expenses as those for rent, insurance, taxes, utilities, cleaning, tuition, and doctors from current income.

## III. EXISTENCE OF NON-TAXABLE INCOME

■■ When the net worth method of proof is used, the government must show either a "likely source of income" or must negate all possible non-taxable sources of the net worth increases. The Supreme Court, in the case of United States v. Massei, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958), stated the rule in a brief per curiam decision:

"In *Holland* (348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150) we held that proof of a likely source was 'sufficient' to convict in a net worth case where the Government did not negative all the possible nontaxable sources of the alleged net worth increase. This was not intended to imply that proof of a likely source was necessary in every case. On the contrary, should all possible sources of nontaxable income be negatived, there would be no necessity for proof of a likely source."

See also United States v. Schipani, 362 F.2d 825, 830 (2d Cir. 1966); United States v. Ford, 237 F.2d 57, 65 (2d Cir. 1956), rev'd on other grounds, 355 U.S. 38, 78 S.Ct. 114, 2 L.Ed.2d 71 (1957) (per curiam). Sources of non-taxable income do not need to be negatived to a certainty. Proof of lack of such sources beyond a reasonable doubt is sufficient.

■ Defendant's defense that his income during the indictment period may have been non-taxable proceeds from crime is untenable. C. I. R. v. Tellier, 383 U.S. 687, 691, 86 S.Ct. 1118, 16 L.Ed. 2d 185 (1966); James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961). The tax law "does not concern itself with the lawfulness of the income that it taxes. Income from a criminal enterprise is taxed at a rate no higher and no lower than income from more conventional sources." C. I. R. v. Tellier, 383 U.S. 687, 691, 86 S.Ct. 1118, 1120 (1966).

■ The government has satisfactorily negated non-taxable sources. During the thorough and intensive investigation conducted by the government, the following steps were undertaken in an attempt to ascertain whether the defendant had any non-taxable income:

1. The records of the Surrogate's Court in Kings County and New York County, covering the period 1932–1960, were checked for possible legacies from relatives of the defendant and his family.

2. The records of the Registrar's office in the counties of New York, Kings and Nassau were checked from 1940

through 1960 to determine whether the defendant or his wife had purchased or sold any real property, and whether they had given or received any mortgages.

3. The government made inquiry of forty banks in Brooklyn; thirty-two banks in Nassau County; five banks in Queens County; and seven banks in New York County. Three of the banks in New York County maintained central indices so that inquiry at a central location would provide information as to branch offices. The government attempted to locate: checking accounts; savings accounts; safe deposit boxes, opened or closed, in the name of the defendant or his wife; and any loans obtained by the defendant or his wife. In determining which banks to check the government took into consideration any leads uncovered during the investigation. For example, any banks located in the vicinity of the defendant's residences in Brooklyn and Nassau or in other areas he frequented were contacted. In addition, any banks used by the defendant for the purchase of money orders or used by people who were in touch with the defendant were checked.

4. Inquiry was made at various finance companies in the New York area to determine whether any loans were obtained by the defendant or his wife.

5. Inquiry was made at the major credit bureaus and credit agencies in Brooklyn, Queens County, and Nassau County to determine whether any loans were obtained by the defendant or his wife.

6. Numerous friends and relatives of the defendant and his family were questioned to determine whether they had had any financial transactions with the defendant or his wife. Inquiry was made of all the defendant's living relatives, as well as more than seventy of the defendant's friends or acquaintances, who, the investigation indicated, were in contact with the defendant.

7. The records of the Brooklyn and Manhattan offices of the Internal Revenue Service were checked to ascertain whether any gift tax returns were filed by any of the defendant's relatives.

8. The records of the Treasury Department were checked to determine whether the defendant or his wife had purchased or cashed any United States Savings Bonds.

9. The government made inquiry of major insurance companies.

10. The government was in touch with thirty brokerage firms in New York.

11. The government checked retail stores and businesses in the defendant's neighborhood in an attempt to ascertain the amounts of goods and services he purchased.

12. Inquiry was made at the Nassau County Treasurer's office to ascertain the amounts of realty taxes paid by the defendant.

13. Numerous Internal Revenue district offices were contacted to ascertain if the defendant or his wife had filed tax returns.

14. Any leads obtained by the government during the investigation relating to the defendant's financial situation were diligently checked.

The Court of Appeals in reviewing the defendant's conviction after the first trial—and in this respect the evidence in both trials is identical—indicated that there had been sufficient negation of non-taxable sources of income:

> "The appellant has not on this appeal suggested any non-taxable sources other than a cash hoard, and it appears that the Government negatived all other reasonably possible sources from which Schipani could have acquired non-taxable funds. Under the circumstances, proof of a 'likely source' of net worth increases is not necessary. United States v. Massei, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958)." United States v. Schipani, 362 F.2d 825, 830 (2d Cir. 1966).

## IV. ALLOCATION OF INCOME TO PARTICULAR YEARS

■■ In a tax evasion case, each offense must relate to a given tax year. When an increase in assets is apparent over a number of years, it is necessary to show year by year increases. Each year end then becomes the starting point for the succeeding year.

A review of the expenditures made by the defendant in the pre-indictment and indictment period reveal a gradual increase of expenditures over the years. They show a man living up to his full income. It is entirely reasonable to infer that defendant's income and expenditures were in close balance each year.

■ While the indictment charged specific taxable income in dollars and cents—e. g., $13,280.06 during the calendar year 1956—it is enough to show that the defendant earned more than the amount required to file a tax return and pay a tax. The probability is that defendant earned more than the sums charged in the indictment, and that probability increases as the amount allegedly earned is reduced. For example, if it is 80% probable that the defendant earned $15,000 or more in any one year, it may become 90% probable that he earned more than $10,000 and 99% probable that he earned more than $5,000. The government has established beyond a reasonable doubt that the defendant earned substantially more than was required to make him liable to pay an income tax in each of the years 1956 to 1960.

## V. WILFULNESS

■ The evidence in this case clearly supports the conclusion that the defendant wilfully attempted to evade and defeat income taxes for each year charged in the indictment. The following factors show a pattern consistent only with that of a guilty mind:

1. The defendant did not file any tax returns, nor did he pay any taxes during any of the indictment years.

2. In addition, the defendant attempted, by various devices, to conceal his income during these years. Among the means he used were the following:

(a) The defendant did not maintain any bank account during the indictment years, with the exception of three small trust accounts for his children, which he maintained in the name of his wife, despite the fact that he received substantial amounts of money during this period.

(b) The defendant maintained a safe deposit box at the Dime Savings Bank, in the name of Nancy Segreto.

(c) The defendant used currency to make payments during the indictment years. In 1956 he purchased $15,000 worth of furniture, which he paid for in cash (he had received $10,000 in cash that year from a mortgage on his home). He paid approximately $6,000 in cash in connection with his son's wedding. The defendant also used currency to make payments for living expenses during the indictment years, including rent in 1956–1960, mortgage payments in 1956, garage bills in 1957–1960, and medical expenses in 1957–1960.

(d) The defendant purchased money orders at various bank branches to make other payments during the indictment years. In making these payments, the defendant frequently signed someone else's name to the money order. Money orders used by the defendant between 1956 and 1960 were signed by him in the name of "Anne Scalfani" (the maiden name of his wife), "Joseph Dantuono," "Louis Esposito," "Mrs. J. Segreto," "Nancy Segreto," and "Stephen Ucciardi."

(e) The defendant rarely purchased property in his own name. In 1955 and 1956 he purchased cars in the name of "Anne Scalfani." He apparently also used a false name, "J. Shippe," when he made arrangements for the delivery of one car.

In 1958, the defendant purchased a twenty-two foot Chris Craft boat in the name of "Louis Esposito." He posed

as Louis Esposito in renting dock space in 1959.

During the years 1956 through 1958, the defendant frequently used a 1957 Buick, which was allegedly owned by Joseph Dantuono. The evidence in the case strongly suggests that the automobile actually belonged to the defendant, and that Dantuono was a nominal owner.

(f) The defendant attempted to conceal his sources of income during the indictment years by making false statements with respect to his occupation. In February, 1957, the defendant stated in an application for insurance that he was employed as a timekeeper and chief pay clerk at Universal Ship Scaling Company, and that he had been so employed for the preceding five years. In September, 1957, the defendant stated again, in an amendment to an application for insurance, that he was employed as a timekeeper by Universal Ship Scaling Company. In December, 1958, on his wife's hospital admission record, the defendant stated that he was employed as a timekeeper by National Ship Scaling Company.

These statements by the defendant concerning his occupation were false. National Ship Scaling Company went into bankruptcy in 1949, and was succeeded by the Universal Ship Scaling Company. Approximately one year later, in 1950 or 1951, Universal Ship Scaling Company also went out of business. Moreover, there is no record of such employment with the Social Security Administration.

The defendant also claimed, on a number of occasions in 1958, that he was employed by Riveredge Transportation and Storage Company as a "soliciter," or as a "salesman" and that he had been so employed for years. These statements were untrue. Neither the company nor the Social Security Administration has any record of the defendant's having been employed by Riveredge.

■ Defendant's evasive conduct is strong proof of a guilty state of mind

supporting a finding of wilful evasion. It also permits an inference that he had income which he was trying to conceal from the government. Behavior proving a guilty state of mind has been held sufficient to support a finding of guilt in a homicide case even where the dead man's body was never discovered. See Regina v. Onufrejczyk, 1 All.E.R. 247 (Ct. of Crim.App.1955). As the Supreme Court noted in Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943):

> "affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal."

## VI. ALTERNATIVE HYPOTHESES

■ Net worth cases are merely special forms of litigation resting on circumstantial proof. There comes a point in such cases where the government's proof is so compelling that "the defendant remains quiet at his peril." Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). This does not mean that the defendant has any burden to come forward with evidence. It means that when the evidence of the government becomes overwhelmingly persuasive the defendant runs the risk of the trier finding that the case has been proved beyond a reasonable doubt unless he can reduce its apparent probative force by producing contrary evidence.

■ Alternative hypotheses of innocence might, of course, explain defendant's conduct. He may have acquired a large sum prior to the indictment period and lived on this alone. Touched with paranoia, or well founded fears of

prior or current associates, or a desire not to invite the jealousy of ancient gods on himself or his family, or the desire to escape the importunings of relatives and organized charities, it is possible that this hypothetical lode was surreptitiously mined, this figmental mattress privately unstuffed, by this defendant.

Such explanations are simply unbelievable in view of the accused's character as clearly revealed by the evidence and confirmed by the Court's observation of the defendant during the course of this trial. He is, in appearance, a distinguished middle-aged gentleman—grey haired, impeccably groomed, tanned, physically fit, and carrying himself with assurance and dignity. He responds intelligently and, in the courtroom setting, politely. He has an apparently warm relationship with his wife and children as witness expenditures for their comfort and an extravagant wedding for his son. His siblings are loyal and close as indicated by their concern for his children when he was incarcerated. He enjoys clean fun as is shown by his membership in a health club and ownership of a fishing boat. He has close friends willing to lend their names as references and financial fronts. He is shrewd, calculating and rational as indicated by the details of his fiscal activities.

In short, the defendant's character does not permit the inference of misanthropic innocence. It confirms all of the evidence in the case pointing to guilt.

## VII. DEFENDANT'S PHYSICAL APPEARANCE

■ The trier's observation of the non-witness defendant's demeanor and general appearance may be—and almost invariably is—considered by him in evaluating evidence introduced at the trial. See, e. g., Stein v. People of State of New York, 346 U.S. 156, 181, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953) (trial judge and jury in better position than appellate court to determine if confession coerced by observing parties; defendants did not take stand); Morrison v. People of State of California, 291 U.S. 82, 94, 54 S.Ct. 281, 78 L.Ed. 664 (1934) (jury might find defendant was oriental even if he did not take stand); State v. McKinnon, 158 Iowa 619, 138 N.W. 523 (1912); Michael & Adler, Real Proof, 5 Vand.L.Rev. 344, 365 (1952). Michael and Adler succinctly summed up the law on this aspect of real proof when they wrote:

> "Demeanor, whether that of a witness while testifying or of a person who is not giving testimony, is * * * a kind of event * * * which occurs in the presence of a jury and is sensibly apparent to it. Consequently, such an event need not be offered and cannot be excluded. The chief problem * * * is * * * estimation of * * * probative force." Michael & Adler, Real Proof, 5 Vand.L.Rev. 344, 365 (1952).

■ In this case the conclusion that defendant was guilty beyond a reasonable doubt was reached solely on the record. Confirmation came from observation of the defendant in court. For whatever assistance it may give to the appellate court, the trial court finds that, were the evidence formally introduced insufficient to satisfy the government's burden of proof, the real proof would not save the government's case. Cf. Federal Deposit Ins. Corporation v. Siraco, 174 F.2d 360, 363–364 (2d Cir. 1949); Rains v. Rains, 127 N.J.Eq. 328, 12 A.2d 857, 860 (1940); Note, Replacing Finders of Fact—Judge, Juror, Administrative Hearing Officer, 68 Colum.L.Rev. 1317, 1327–29 (1968).

## VIII. CONCLUSION

During each of the years charged in the indictment the defendant had substantial taxable income greatly in excess of six hundred dollars. During each of these years he should have paid a substantial income tax. He failed to file income tax returns and concealed his income wilfully in order to defraud the government of income taxes due by him to the government. The government has

proved beyond a reasonable doubt all the elements of the crime charged for each of the years charged in the indictment. The defendant is guilty as charged on all counts.