**UNITED STATES of America,**
v.
**Igor A. IVANOV, Defendant.**
Crim. No. 418–63.

United States District Court,
D. New Jersey.

May 17, 1972.

Herbert J. Stern, U. S. Atty., by Jonathan L. Goldstein, First Asst. U. S. Atty., Newark, N. J., for plaintiff.

Williams & Connolly, by Robert L. Weinberg, and Vincent J. Fuller (D.C. Bar), Washington, D. C., for defendant Igor A. Ivanov.

### MEMORANDUM and ORDER

AUGELLI, District Judge:

Defendant Ivanov and a codefendant, John William Butenko, were convicted of conspiring to transmit to the Soviet Union information relating to the national defense of the United States.[1] The convictions, with a modification not here material, were affirmed by the Court of Appeals. United States v Butenko, 384 F.2d 554 (3 Cir. 1967).

Following affirmance of the convictions, and while the cases were pending in the United States Supreme Court, it was there revealed that the Government had engaged in electronic surveillances which might have violated defendants' Fourth Amendment rights and tainted

---

1. The indictment in this case was returned on November 7, 1963. The conspiracy alleged therein covered the period from April 21, 1963 to and including October 29, 1963. Ivanov and his codefendant Butenko were arrested in New Jersey on October 29, 1963. Trial, before the writer of this memorandum, commenced on October 22, 1964 and was concluded on December 2, 1964, with jury verdicts of guilty. Sentences were imposed on December 18, 1964.

their convictions. A remand to this Court was ordered to determine (1) if the electronic surveillances of defendants were illegal and (2) if so, did such illegal electronic surveillances taint the convictions. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), which included the Ivanov and Butenko cases. See, also, Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297, and Taglianetti v. United States, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302. This memorandum is concerned only with the Ivanov conviction.

After remand, and prior to the hearing conducted pursuant thereto, the Government voluntarily turned over to Ivanov's counsel logs of electronic surveillances, designated in the record as 4001–S* and 4002–S*, alleged by the Government to be all of the logs of the electronic surveillances directed against Ivanov and one Vladimir I. Karatsuba. These surveillances were conducted by Agents of the Federal Bureau of Investigation (FBI) in their investigation of possible espionage activity by Ivanov and Karatsuba.[2] Surveillance 4001–S* was directed against Karatsuba and 4002–S* against Ivanov. Both were put into operation on May 7, 1963. The one against Ivanov was discontinued on or about June 18, 1963, and the one against Karatsuba was discontinued on or about September 10, 1963.

At the hearing on the remanded issues, the Government conceded the illegality of the electronic surveillances 4001–S* and 4002–S*. This admitted violation of Ivanov's Fourth Amendment rights reduces the issue to be decided to a determination of whether Ivanov's

conviction was tainted by such violation. The hearings were extensive, covering the period from March 29 to April 2, 1971, with many exhibits. The Government made available to Ivanov for examination by his counsel, all Officials, Supervisors and Agents of the FBI who directed, supervised or participated in the electronic surveillances. These were:

John F. Malone, Assistant Director of the FBI, in charge of the New York Office of the FBI. This man had general overall responsibility for the investigation and prosecution of Ivanov;

Joseph L. Schmit, Special Agent in Charge of the Espionage and Foreign Intelligence Division. It was Schmit who, based on information in his possession, recommended the electronic surveillance of Ivanov;

Lawrence McWilliams, Special Agent of the FBI, and Supervisor of a squad in the Espionage and Foreign Intelligence Division of the FBI New York Office. McWilliams is the Agent who supervised the electronic surveillances of Ivanov and Karatsuba;

Grover T. Martin, Special Agent of the FBI assigned to the Espionage and Foreign Intelligence Division of the FBI New York Office. Martin was a member of McWilliams' squad, but did not participate in the electronic surveillances. He did, however, conduct a visual surveillance of Ivanov in New York;

Joseph L. Conway, Special Agent of the FBI assigned to Supervisor Edward F. Gamber's squad in the Espionage and Foreign Intelligence Division of the FBI New York Office. Conway participated in the electronic surveillances of Ivanov

---

2. Prior to April 21, 1963, the FBI was extremely suspicious of Karatsuba, who was believed to be a very active intelligence officer. The primary reason for instituting the electronic surveillances here involved was to gather information concerning this individual. Ivanov became the subject of electronic surveillance after he had been observed by the FBI in New Jersey on April 21, 1963, engaged in what was suspected of being

an intelligence operation. Since Ivanov and Karatsuba, and their respective families, during the period of surveillance, occupied adjoining apartments in a building located at 271 Beach 17th Street, Far Rockaway, Queens, New York, it was a comparatively simple matter to cover both individuals. For the purposes of this case, it will be assumed that electronic surveillances 4001–S* and 4002–S* were directed solely against Ivanov.

and Karatsuba under Supervisor Mc-Williams' direction;

Thomas J. Manning, Special Agent of the FBI assigned to Supervisor Solomon's squad in the New York Office of the FBI. Manning was ordered by Solomon to assist in the electronic surveillances of Ivanov and Karatsuba under the supervision of Supervisor Mc-Williams;

Juell R. Ness, Special Agent of the FBI and a member of Supervisor Mc-Williams' squad;

Paul J. Blasco, Special Agent of the FBI assigned to the FBI Office in Newark, New Jersey. Blasco functioned in a liaison capacity between the New York Office of the FBI and the United States Attorney's Office prior to and during the course of the trial of Ivanov and Butenko; and

Sanford M. Jaffe, the Assistant United States Attorney who prosecuted Ivanov and Butenko.

In addition to the "live" testimony of these witnesses, the testimony of 21 other FBI Agents was a matter of stipulations made during the course of the hearings or filed separately in the case.

At the outset, let it be stated that this Court, on the basis of the record and representations made by the Government, is satisfied that there were only five electronic surveillances on which Ivanov was overheard, and further, that the logs resulting from electronic surveillances 4001–S* and 4002–S* are the only ones that may properly be considered on the taint issue, and to which Ivanov is entitled.[3]

A careful review of the evidence adduced at the hearing conclusively shows that Ivanov's conviction was not in any way tainted by reason of the unlawful electronic surveillances conducted by the Government. A summary of the testimony at this point, before proceeding to a consideration of the arguments advanced in Ivanov's behalf, will be helpful.

John F. Malone had the overall responsibility for the investigation and prosecution of Ivanov. In the chain of command, Malone was the immediate superior of Special Agent in Charge Joseph L. Schmit. Malone was advised periodically by Schmit of developments in the case and was consulted about any major decisions made in connection therewith.

Malone testified that it was not until 1971 that he learned about the electronic surveillance of Ivanov; that he at no time discussed any electronic surveillances concerning Ivanov with Schmit or any other Agent; and that he never did see the logs of the electronic surveillances. Malone further testified that he never gave any instructions regarding preservation or destruction or erasure of any tapes used in the course of the Ivanov electronic surveillance, nor was he aware of any published instructions on the subject. Malone said that in 1963, and up to 1968, it was established FBI procedure to erase electronic surveillance tapes and to preserve their contents by summary log entries. Prior to 1968, such tapes would be kept for a period of two weeks and then, if there were no court order or other reason to keep them

---

3. In addition to logs 4001–S * and 4002–S *, mention is also made in the record to other surveillances in the possession of the Government which reflected telephone conversations of Ivanov that were overheard on wiretaps maintained on other premises. These were three in number. The Government refused to turn this material over to Ivanov, despite his demand therefor, because it was claimed that these particular overhearings occurred in the course of electronic surveillances expressly authorized by the Attorney General for the sole purpose of gathering foreign intelligence information, and that such surveillances were not directed against Ivanov. This Court, after an examination of these logs *in camera*, concluded that said surveillances were lawful and not in violation of Ivanov's rights under the Fourth Amendment or Section 605 of the Federal Communications Act of 1934, 47 U.S.C. § 605, and upheld the Government's refusal to turn over the material. See United States v. Butenko, 318 F.Supp. 66 (D.N.J.1970).

beyond that period, the tapes would be erased in the interest of saving space and expense, and used over and over again.

Joseph L. Schmit, as Special Agent in Charge of the Espionage and Foreign Intelligence Division of the New York Office of the FBI, had approximately 400 Agents working under him. The Division was broken down into a number of squads, each squad being headed by a Supervisor. The Supervisors would report to Schmit, and be responsible for the details of carrying out the investigations entrusted to them. The Supervisor in charge of the electronic surveillances of Ivanov and Karatsuba was Lawrence McWilliams. These surveillances were instituted on Schmit's recommendation.[3A]

During the course of the electronic surveillances, McWilliams would provide Schmit with written 90-day progress reports. These reports, said Schmit, were "non productive" in that they contained no information of any espionage activity. Schmit testified that if anything of significance were disclosed as a result of the electronic surveillances, the Supervisor would ordinarily be required to bring it to Schmit's attention. In this particular case nothing of any intelligence value was reported by McWilliams to Schmit. There was further testimony by Schmit that at no time did he read the logs of the Ivanov electronic surveillances, and further, that he never discussed the matter with anyone other than McWilliams and with whomever was in charge of the espionage section of the FBI in Washington.

The procedures to be followed in recording and preserving electronic surveillance tapes were left by Schmit to the judgment of his Supervisors. The determination as to whether the tapes used in the Ivanov electronic surveillance should be preserved, erased or destroyed was left to McWilliams, and it was his responsibility to advise the Agents working under his supervision as to what procedures were to be followed.

As previously mentioned, Lawrence McWilliams was the Supervisor under whose direction the Ivanov and Karatsuba electronic surveillances were conducted. McWilliams first heard of Ivanov in 1962, when the latter came to this country. It was McWilliams' responsibility, as a matter of routine, to ascertain the names and places of assignment of Soviet citizens entering the United States. It was not until April 21, 1963, or shortly thereafter, that McWilliams was informed that Ivanov was observed in New Jersey on April 21, 1963, engaged in what was suspected of being an intelligence operation. The record indicates rather clearly that this information was passed on to McWilliams by Supervisor Edward F. Gamber, who was the FBI Special Agent in charge of the investigation of Ivanov's codefendant Butenko and the other conspirators named in the indictment that was handed down in this case on November 7, 1963. The information went from Gamber to McWilliams because each handled certain phases of the then ongoing investigations, and the investigation of Ivanov was within McWilliams', and not Gamber's, area of responsibility.

The Agents who participated in the electronic surveillances of Karatsuba (4001–S\*) and Ivanov (4002–S\*) were all instructed by McWilliams to report to him on the progress and operation of the surveillances. The Agents were under orders to "cut" a tape, that is,

---

**3A.** Schmit's recommendation was based on information in his possession that indicated possible espionage activity by Ivanov and Karatsuba. The decision to institute the electronic surveillances recommended by Schmit was made by other authority. Schmit had no recollection of the date on which he made his recommendation. It was made, he said, in "approximately 1962." The date of Schmit's recommendation is of no moment because the record is clear that such recommendation was not implemented and put into operation until May 7, 1963, and also because of this Court's conclusion that the electronic surveillances were non-productive.

record the sounds that came over the equipment whenever they heard distinguishable adult voices in English or Russian.[4] It was left to the judgment of each monitoring Agent to determine if what he heard was of any value from an intelligence viewpoint. If the Agent determined that information of value had come over the equipment, he was required to report it to McWilliams immediately, preferably by phone, day or night. McWilliams was very definite in his testimony that he "never" received any reports from any of his men that indicated anything of value. He said the only reports he received were that the electronic surveillances were ineffective.

During the spring, summer and fall of 1963, McWilliams and Gamber coordinated their efforts and exchanged information regarding their respective investigations of Butenko, Ivanov, and their co-conspirators. McWilliams stressed the fact that the overall investigation of Butenko and his co-conspirators was Gamber's responsibility, and that any information obtained in that investigation, even as it related to Ivanov, was within the area of Gamber's supervision and subject thereto.

■ There is no doubt that the Government sought to ascertain from the electronic surveillance of Ivanov information to corroborate Gamber's communicated suspicion to McWilliams on April 21, 1963, that Ivanov was engaged in unlawful espionage activities. The decision to implement the earlier made recommendation that Ivanov and Karatsuba be electronically surveilled was made shortly after April 21, 1963. It was hoped that electronic surveillances 4001–S* and 4002–S* would produce in-

telligence information involving both men. But it is clear from the record that these hopes were not realized. There is ample support in the record for McWilliams' assertion that electronic surveillance tapes 4001–S* and 4002–S* did not provide any investigative leads at all, and that no specific information from the logs of said surveillances was transmitted to Gamber because the material was of no intelligence value. As a matter of fact, McWilliams admitted that the electronic surveillance of Ivanov conducted under his supervision produced no evidence that would have warranted Ivanov's arrest for engaging in any unlawful activity.[5] The Court is satisfied that it was the visual surveillance of Ivanov's suspicious activities in New Jersey by Gamber's men on April 21, 1963, which started the investigation that ultimately led to Ivanov's arrest, prosecution and conviction. Electronic surveillances were not in operation on that date.

The ineffectiveness of the electronic surveillances led to their discontinuance. The sounds picked up over the recording mechanism were those common to a household, such as children's voices, radio noises, kitchen activity, and the like. Rarely did intelligible adult conversations come through, and no clear conversation of Ivanov was received over the equipment. It was this continued lack of any material of investigative value that caused McWilliams to recommend to his superior, Joseph L. Schmit, that the electronic surveillances be discontinued, which recommendation was approved. The Ivanov electronic surveillance was terminated on June 18, 1963, and Karatsuba's on September 10, 1963.

---

4. Some of the monitoring Agents understood the Russian language, others did not. As to the latter, if the recorded conversation was in Russian, the original tape would be translated into the English language by Agents versed in Russian. A number of the logs in 4001–S * and 4002–S * have been so translated.

5. McWilliams routinely read the logs turned in by his men on the same day the entries were made or on the following day, depending on the interoffice mail and the availability of the translation from the Russian language of what was heard. McWilliams testified that to the best of his recollection, none of the logs reflecting electronic surveillances 4001–S * and 4002–S * were lost or misplaced.

The original tapes from which logs 4001–S* and 4002–S* are derived were not available for examination or playback at the hearing. It appears that McWilliams and the men under his command, in good faith, followed what was believed to be the then standard and accepted FBI practice that tapes were to be erased unless orders were given to preserve them. However, it is noted that in this particular case, McWilliams had instructed his men that if the tapes contained anything which, in their judgment, was of value, the tape was to be maintained and not erased. In such a situation McWilliams would make the final determination of what was "of value" and thus preserved. McWilliams' statement that, consistent with the then established FBI policy, none of the original tapes of electronic surveillances 4001–S* and 4002–S* were maintained because they were of no investigative value, is amply supported by the record.

Grover T. Martin was a member of McWilliams' squad, and the case agent assigned to Ivanov. He did not have Ivanov under investigation for any alleged espionage activity until April, 1963. At various times, Martin would conduct a visual surveillance of Ivanov in Far Rockaway, New York, and report thereon to his superior McWilliams. As case agent, Martin would initially receive all information regarding Ivanov's activities from other FBI Agents working on the case. Martin did not participate in the electronic surveillance of Ivanov. He did, however, know that between the dates of May 7 and June 18, 1963, Ivanov was the subject of such surveillance, and Martin would review the logs pertaining thereto,[6] and probably discuss them with McWilliams. Assuming there were such discussions, the record is clear that the electronic surveillance of Ivanov, as reflected by the log entries, and contrary to FBI expectations, was continuously of no investigative value.

The Court is satisfied that Martin's investigation of Ivanov had no material bearing on the espionage investigation of Ivanov being conducted by the men of Supervisor Gamber's squad. Martin testified that during the period of his visual surveillance of Ivanov, which extended intermittently from April 22 to October 25, 1963, nothing came to his attention that would indicate espionage activity by Ivanov; that he did not furnish, nor was he asked to furnish, to the Agent conducting the espionage investigation of Ivanov, any material gathered by him (Martin); that he did not coordinate his visual surveillance of Ivanov with the electronic surveillance of that individual; that he at no time surveilled Ivanov from New York to any point in New Jersey; and that he never provided any Agent, including Gamber, with any investigative leads from a reading of the logs of the electronic surveillances for the simple reason that nothing of any investigative value was reflected thereon.[7]

Joseph L. Conway was a member of Supervisor Gamber's squad in the Espionage and Foreign Intelligence Division of the New York Office of the FBI. On occasion, in 1963, Conway would be assigned by Gamber to work with McWilliams in connection with the electronic surveillances of Ivanov and Karatsu-

---

6. There is some confusion in the record as to the identifying number of the surveillance logs examined by Martin. He referred to electronic surveillance number 4001–S *, which was primarily concerned with Karatsuba. The Ivanov electronic surveillance was 4002–S *. However, the record is clear that Martin was referring to the Ivanov surveillance. The matter is of no importance because, as pointed out earlier in this memorandum, the Court is assuming, for the purposes of this case, that both 4001–S * and 4002–S * were directed against Ivanov.

7. Martin testified that so far as he knew, the electronic surveillance logs were forwarded to the Agents and to the United States Attorney to prepare the case for trial. Martin is mistaken in his belief that this was done. The Court finds as entirely credible on this point the contrary testimony given by the Assistant United States Attorney who tried the case.

ba. During the period of Conway's participation in such surveillances, he would report to Gamber on the progress of same. The entries initialed by Conway on the electronic surveillance logs 4001–S* and 4002–S* show the dates of his participation in the operation.[8]

One date of Conway's participation in the electronic surveillance of Ivanov was May 25, 1963. Conway also testified that he visually observed Ivanov in New Jersey on May 26, 1963. Despite the inference that is sought to be drawn because of the proximity in dates, the Court is satisfied and finds, based on an examination of the logs and the testimony in this case, that there was no evidentiary link between Conway's electronic surveillance of Ivanov on May 25, 1963, and his physical surveillance of Ivanov in New Jersey on May 26, 1963.

Conway testified that he was interviewed by Sanford M. Jaffe, the Assistant United States Attorney who tried the Ivanov case. Unquestionably, Conway apprised Jaffe of all matters of importance pertaining to the preparation of the case for trial. In this connection the Court is satisfied, contrary to the belief expressed by Agent Martin (see Note 7 of this memorandum), that the electronic surveillance logs in this case were not forwarded by any of the Agents to Jaffe for use in preparation of the case for trial. Conway was very definite in his statement that he did not tell Jaffe about the electronic surveillances of Ivanov and Karatsuba in which he participated for the reason that in his professional judgment they disclosed nothing of value.

Although the Government had expectations of obtaining by means of electronic surveillances 4001–S* and 4002–S* some information of value on the suspected espionage activity of Ivanov (and also Karatsuba), that this hope was not realized is apparent by the log entries made in connection with those surveillances and the non-preservation of the original tapes. Conway testified that he never effectively used the results of the electronic surveillances in his investigation of Ivanov which led to Ivanov's conviction. The record fully supports this assertion.

Thomas J. Manning, on occasions between May 7 and September 10, 1963, participated in monitoring electronic surveillances 4001–S* and 4002–S*. Manning was a member of Supervisor Robert Solomon's squad, and was assigned by Solomon to McWilliams' squad to assist in the electronic surveillance of Ivanov.

In the performance of his duties Manning, who could speak and understand the Russian language, would make notes of the conversations recorded verbatim on the tapes, and then shortly thereafter prepare therefrom the summaries which became his log entries. The notes were then destroyed. Manning sent all of his log entries through FBI channels, by means of which they presumably reached his superior, Solomon. Manning testified that he did not know what happened to the logs, intended for his superior, Solomon, after they left his (Manning's) possession; that neither the logs nor any information he had concerning the investigation of Ivanov was made available by him to Supervisor Gamber or any other Agent; and that he had no knowledge of any such information reaching other Agents.

Manning further testified concerning the instructions he had received from McWilliams, that if anything of value was overheard he, Manning, was to immediately communicate such information to McWilliams. Manning said also that at no time did he communicate with McWilliams because he did not, in his professional judgment, hear anything of any intelligence value as a result of electronic surveillances 4001–S* and 4002–S*. Manning had no knowledge as to whether the tape recordings he used were

---

8. There is some confusion in the record regarding the authenticity of some of the log entry dates on which it was alleged

the electronic surveillances were being conducted. This matter will be discussed later in this memorandum.

subsequently erased, destroyed or preserved, nor did he receive any instructions regarding the same.

Juell R. Ness, a member of McWilliams' squad, participated in electronic surveillances 4001–S* and 4002–S* on May 9 and May 12, 1963.

Ness corroborates the testimony of other Agents that he was instructed by McWilliams to record any significant information that was overheard in the surveillance operation. It was up to the individual Agent to determine what was significant and worthy of recordation and log notation. No one, other than McWilliams, said Ness, gave him any instructions with respect to monitoring or recording the conversations that were overheard.

Ness testified he never dicussed his investigation of Ivanov with Mr. Jaffe (the Assistant United States Attorney who tried the case), nor did he inform Jaffe that he (Ness) had participated in the electronic surveillances, and Jaffe did not question him about such surveillances. Ness did not personally turn anything over to Jaffe, but said he believed that when he was interviewed by Jaffe, he (Jaffe) had in his possession a copy of Ness's physical surveillance of Ivanov. As to any other material in Jaffe's possession, the witness was unable to say.

Paul J. Blasco was a Special Agent stationed in the Newark Office of the FBI.

On various occasions prior to and during the course of the trial of Ivanov and Butenko, Blasco would act in a liaison capacity in relaying reports between Mr. Jaffe and the New York Office of the FBI, and would also be instrumental in alerting witnesses as to times to be available to give testimony in court.

At the time of Ivanov's arrest on October 29, 1963, Blasco was not aware that Ivanov or Butenko were the subjects of electronic surveillances. Blasco first learned about the surveillances some two or three years after the trial had been concluded.

Sanford M. Jaffe, as already stated, was the Assistant United States Attorney who prosecuted Ivanov and Butenko.

Jaffe was very definite in his testimony that in the course of his preparation of the case for trial, he never came across any electronic surveillance logs involving either Ivanov or Butenko, nor was he informed by any FBI Agent or anyone else that any electronic surveillances of Ivanov or Butenko or any of the alleged co-conspirators had taken place. It was not until years after the trial was concluded, that Jaffe learned that Ivanov and Butenko had been the subjects of electronic surveillances.

The stipulated testimony of the other FBI Agents, 21 in number, who participated in electronic surveillances 4001–S* and 4002–S*, all indicate, to the Court's satisfaction, that none of the material gathered as a result of such surveillances found its way into the trial of Ivanov, and that none of it could possibly be considered as in any way tainting the conviction of Ivanov.

There is no question in the Court's mind, based on personal knowledge of the trial, and a careful review of the evidence adduced at the taint hearing, that the arrest and subsequent conviction of Ivanov resulted from the Government's independent investigation of the case, in which electronic surveillances 4001–S* and 4002–S* played no part.

### LAW

Ivanov contends that a new final judgment of conviction is precluded in his case for a number of reasons. These will now be considered.

One of the grounds urged by Ivanov is that his Fourth Amendment rights were violated by electronic surveillances 4001–S* and 4002–S* and that the Government has failed to sustain the burden of proving that Ivanov's conviction was not tainted by such violation.

Since the Government, for the purposes of this case, has conceded that the electronic surveillances in question were unlawful, there is no need to further pursue this issue.

As to the burden of proof on the taint issue, the record discloses that during the critical period covered by the indictment in this case (April 21 through October 29, 1963), the FBI conducted visual surveillances of Ivanov and his coconspirators. During some of this same period, FBI Agents also engaged in an electronic surveillance of Ivanov to aid them in their investigation of Ivanov's alleged illegal activity. Although the Government pursued such electronic surveillance in the hope of gathering material of value to buttress their suspicions concerning Ivanov, it is clear that the hoped for fruits of the illegal electronic surveillance did not materialize, and that this unlawful activity did not in any way taint Ivanov's conviction. The electronic surveillances in this case were ineffective and unsuccessful. What they produced was, at best, innocuous, even when viewed by the specially trained and experienced FBI Agents. An examination of the logs, reflecting summaries of the surveillance tapes, reveals nothing more than a history of small talk and unintelligible chatter of such obvious insignificance that the FBI discontinued its electronic surveillance of Ivanov on June 18, 1963, because of its demonstrated consistent showing of non-productivity.

The recognized synthesis, indicating whose burden it is to show taint from an illegal search, and what the Government must do to overcome such proof, was set forth by Mr. Justice White in Alderman v. United States, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176, where he said:

"The United States concedes that when an illegal search has come to light, it has the ultimate burden of persuasion to show that its evidence is untainted. But at the same time petitioners acknowledge that they must go forward with specific evidence demonstrating taint. '[T]he trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin.' Nardone v. United States, 308 U.S. 338, 341 [60 S.Ct. 266, 268, 84 L.Ed. 307] (1939)."

The principles enunciated by the Supreme Court in Nardone and adhered to in Alderman are readily apparent. The initial burden of going forward and showing specific evidence of taint, and that a substantial portion of the Government's case is traceable to that taint, rests with a defendant. As against this, the Government has the ultimate burden of proving that its evidence is not tainted. But in the absence of a defendant meeting his initial burden, the Government must prevail. The Government's burden to disprove taint arises only after a defendant has shown specific evidence of taint materially affecting the proof adduced in the Government's case. Viewing the testimony and exhibits in the instant case in a light most favorable to Ivanov, and after a careful consideration of all the evidence, the Court is convinced beyond a reasonable doubt, that no specific evidence of taint has been shown by Ivanov.

Ivanov's attempt to show taint to invalidate his conviction is based in large part on inference, innuendo, and speculation. Such will not suffice to meet the initial burden of showing specific evidence of taint. United States v. Nolan, 420 F.2d 552 (5 Cir. 1969); United States v. Brown, 317 F.Supp. 531 (E.D.La.1970); United States v. Annoreno, 321 F.Supp. 957 (N.D.Ill.1971). As was stated in Annoreno, at 958:

"Consistent with the standards set by the Supreme Court in the *Alderman* decision, the defendants have the burden of coming forward with specific evidence of taint. This they have clearly failed to do * * *. The defendants must show a connection between the overhea[r]d conversations and the case made against them. In doing so, they may not rely on speculation and tenuous generalizations, as these defendants have done."

In United States v. Cole, 325 F.Supp. 763 (S.D.N.Y.1971), the court, in denying a post-conviction suppression motion based on unlawful electronic surveillance, made certain observations that would be equally applicable here. Said the court, at 771:

"After the elimination of any stray item as to which the defendants might conceivably complain properly, there was still enough, indeed, overwhelming evidence remaining to sustain the verdict * * *. It is only if a substantial portion of the case against the defendants was a fruit of the poisonous tree, that a conviction may be overturned * * *. Here, there was no such fruit or stated most favorably to defendants there was a miniscule and insubstantial amount of tainted fruit of such gossamer character as not to be readily identifiable. The significant evidence in this case was all of independent origin. There is no reasonable possibility that a substantial portion of the case is tainted."

█ This Court is not persuaded by Ivanov's contention that testimony adduced solely from FBI Agents, called by counsel for Ivanov and subject to full cross-examination by Government counsel, cannot be sufficient proof to uphold the Government's ultimate burden of showing that its evidence was not tainted by illegal eavesdropping. Baker v. United States, 139 U.S.App.D.C. 126, 430 F.2d 499, 501 (1970).

Ivanov's reliance on United States v. Schipani, 289 F.Supp. 43 (E.D.N.Y. 1968), concerning the Government's burden of coming forward and its ultimate burden of proof on the issue of taint, is misplaced. It is Ivanov's contention that the burden of proof is on the Government in the first instance to show absence of taint, and that such proof must be established beyond a reasonable doubt.

Schipani was convicted of income tax evasion. His conviction was affirmed. United States v. Schipani, 362 F.2d 825 (2 Cir. 1966). Thereafter, and while the case was pending in the Supreme Court, the Solicitor General informed the Court that Schipani was a participant in a number of conversations which had been electronically monitored by FBI Agents and which led to the use of tainted evidence against Schipani at his trial. The Supreme Court thereupon, on December 12, 1966, entered a *per curiam* order vacating Schipani's conviction and remanding the case to the District Court for a new trial should the Government decide to prosecute Schipani anew.[9]

Following a detailed review of the record, the Government concluded that none of the evidence it had used against Schipani was tainted, and that the Solicitor General was in error when he informed the Supreme Court to the contrary. Consequently, the decision was made to prosecute anew. Schipani then moved to suppress the evidence. A full evidentiary hearing on the motion to suppress was held by Judge Weinstein. He suppressed only the evidence relating to Schipani's likely sources of income which was introduced at Schipani's first trial, and denied the motion in all other respects. The case was subsequently retried before Judge Weinstein and resulted in a conviction.[10] United States v.

---

9. The *per curiam* order read as follows:
   "Upon the suggestion of the Solicitor General and upon an independent examination of the case, the petition for rehearing is granted, the order of this Court denying certiorari * * * is vacated, certiorari is granted, the judgment of the United States Court of Appeals for the Second Circuit is vacated and the case is remanded to the United States District Court for the Eastern District of New York for a new trial should the Government seek to prosecute petitioner anew." 385 U.S. 372, 87 S.Ct. 533, 17 L.Ed.2d 428.

10. The case was tried on the "net worth" theory. The evidence in such cases usually falls within two categories, one relating to a defendant's opening net worth, and the other to his likely source of income. In the suppression hearing (289 F.Supp. 43) Judge Weinstein found that the only evidence which had been tainted by elec-

Schipani, 293 F.Supp. 156 (E.D.N.Y. 1968), aff'd 414 F.2d 1262 (2 Cir. 1969), cert. denied 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970).

It is the ruling made by Judge Weinstein in the suppression hearing (289 F.Supp. 43) upon which Ivanov places his reliance. But the procedural posture of the instant case and Schipani in the suppression hearing following the remand from the Supreme Court, differ sharply. The remand was based on an independent examination of the record by the Supreme Court and the Solicitor General's suggestion that the evidence used against Schipani in the first trial was tainted. Confronted with this judicial notice of taint, Judge Weinstein was entirely correct, notwithstanding the Government's contention that the Solicitor General was in error, to require the Government to come forward initially and prove ultimately beyond a reasonable doubt that the evidence it sought to introduce at Schipani's retrial was legally obtained.

■■ It should be noted, however, that in Ivanov, unlike in Schipani, there has been no prior judicial notice or suggestion that tainted evidence was used against Ivanov at his trial. Indeed, in its remand in Ivanov, the Supreme Court specifically directed this Court to determine the taint issue in the event the electronic surveillances were found to be unlawful. The illegality of the surveillances having been conceded by the Government, the question posed for decision at the hearing was whether or not any taint was attached to the Government's evidence at Ivanov's trial. The initial burden rested with Ivanov to show, by specific evidence, that a material portion of the case against him was tainted. Had this been established,

then, and not until then, would the burden shift to the Government to show that its evidence against Ivanov was not tainted. The Court finds no specific evidence of taint in this case. Even assuming, *arguendo*, that some such evidence existed, the Court is satisfied beyond a reasonable doubt that in this case the Government has met its ultimate burden [11] of showing that no substantial or measurable portion of the evidence used against Ivanov at his trial was tainted. Baker v. United States, 139 U. S.App.D.C. 126, 430 F.2d 499; United States v. Cole, 325 F.Supp. 763; United States v. Annoreno, 321 F.Supp. 957; United States v. Brown, 317 F.Supp. 531; United States v. Aiuppa, 440 F.2d 893 (10 Cir. 1971).

Ivanov also argues that the destruction through erasure of all tape recordings made in electronic surveillances 4001–S* and 4002–S*, or the absence of verbatim transcripts of the erased recordings, or the absence of some recorded conversation summaries, or the presumed loss of some logs initialed by Agent McWilliams, or the alleged absence of logs for some days during the period of electronic surveillance, taken together or separately, are such "specific evidence" of taint as to shift to the Government the burden of going forward with evidence to show, with respect to each of the allegedly destroyed or missing recordings and logs, that it contained no evidence tending to establish taint. It is also contended that, for these same reasons, exculpatory evidence was withheld, and thus Ivanov's conviction should be invalidated. There is no merit to these several positions taken by Ivanov.

The testimony of the several Agents who testified, when viewed in its entire-

---

tronic surveillance was that relating to Schipani's likely source of income, and that other evidence relating to Schipani's net worth was proved beyond a reasonable doubt to be untainted. These findings were held by the Court of Appeals (414 F.2d 1262) in affirming Schipani's conviction in his second trial (293 F.Supp.

156) to be supported by substantial evidence and were not clearly erroneous.

11. It may be that the Government need show only by a preponderance of the evidence that there has been no violation of Fourth Amendment rights. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

ty, as well as the exhibits marked in evidence, and representations made by Government counsel, satisfy this Court that all logs pertaining to the electronic surveillance of Ivanov have been brought before the Court and made known to Ivanov. There is no reason to doubt "the government's sincerity in making a full and complete disclosure rather than an attempt to frustrate appellant in obtaining a total truthful discovery of the extent and substance of unlawful eavesdropping with respect to which he has standing to object." United States v. Balistrieri, 436 F.2d 1212, 1214 (7 Cir. 1971).

■ The monitoring Agents were specifically instructed to preserve any tape containing information of intelligence value, and to report same to their supervisors. It is assumed the Agents followed orders, and they so testified. The record is crystal clear that nothing of any investigative value resulted from the monitoring. The absence of verbatim transcripts and destruction through erasure of the tape recordings cannot, in this context, be considered affirmative evidence of taint. The instructions given to the monitoring Agents were fully consistent with the then prevailing FBI practice regarding the use of logs in ongoing investigations and the erasure or destruction of ineffective or innocuous tapes after their transcription into log summaries. No evidence was adduced at the hearing in the instant case that such practice lacked authenticity or completeness. United States v. Mirro, 435 F.2d 839 (7 Cir. 1970). Accord, United States v. Stassi 431 F.2d 353 (5 Cir. 1970); United States v. Balistrieri, 436 F.2d 1212 (7 Cir. 1971); United States v. Gornick, 448 F.2d 566 (7 Cir. 1971).

Much emphasis is placed by Ivanov on the assumed absence of logs in surveillance 4002–S* for the dates of May 26 and May 27, 1963. It is claimed that such logs would show taint or exculpatory evidence. A careful examination of the log sheets in evidence (C–6, C–6–1, C–6–2, C–8, C–8–1 and C–8–2) and the testimony relating thereto, does not support the charge. There is some doubt as to some of the dates appearing on the log sheets. The date of C–6–1 could be either May 21 or May 26, 1963, and the date appearing on C–6–2 could be read as either May 22 or May 27, 1963. Log sheet C–8–1 appears to be dated May 21, 1963, and C–8–2 May 22, 1963. Based on his assumption that C–6–1 is the log for May 21 and C–6–2 is the log for May 22, Ivanov concludes that the May 26 and May 27 logs have been lost or destroyed. This conclusion has no foundation in fact. Supervisor McWilliams testified that only one daily log was compiled for each day. Accepting this testimony, as the Court does, it is apparent from an examination of C–6 and C–8 that there were 10 different daily logs for the ten day period running from May 20 through May 29, 1963, and that one each of the 10 logs must be for May 21, May 22, May 26 and May 27, 1963. While there may be some question as to which log is which, the Court is satisfied that all logs covering the period May 20 through May 29, 1963, were in Court and in the possession of Ivanov's counsel, and further that no logs covering the period in question were missing, lost or destroyed.

■ The alleged missing logs for May 26 and May 27 are linked by Ivanov to a visual surveillance made of him in New Jersey on May 26, 1963, by Special Agent Conway. This same Agent also participated in the electronic surveillance of Ivanov, including the date of May 25, 1963. It is argued that the visual and electronic surveillance of Ivanov by Conway would necessarily be sufficiently coordinated to effect taint. There is no support for this in the record. As has been stated time and again the electronic surveillance of Ivanov produced nothing of value. The mere fact that Conway, on May 25, participated in a clearly ineffective electronic surveillance of Ivanov does not, by inference, establish an evidentiary link of taint to his visual surveillance in New Jersey on May 26, 1963, or on any

other day. Conway very definitely testified he did not utilize the results of his electronic surveillances in his investigation of Ivanov that led to Ivanov's conviction. No evidence was adduced at the taint hearing that any testimony given by Conway at Ivanov's trial concerning his visual surveillance of Ivanov on May 26, 1963, was in any way connected with electronic surveillances 4001–S* and 4002–S*. As a matter of fact, an examination of the log for May 25, 1963, in the C–8 group, shows continuous daily entries of "no activity".

Ivanov's claim that he is entitled to a new trial because the Government has destroyed or erased the original electronic surveillance tapes is predicated on an alleged deprivation of potentially exculpatory evidence, in contravention of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The established policy of the FBI in 1963 was to erase tapes after log entries therefrom were made, unless otherwise ordered. In this case, Supervisor Mc-Williams did order that tapes having any investigative value be preserved. None were preserved because they recorded nothing of value. There is no showing of bad faith here.[12] Nonetheless, Ivanov urges that the case of United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971), brings him within the due process sanctuary of Brady. Not so. Bryant is clearly distinguishable on its facts.

The tape in Bryant recorded conversations[13] which were, in the words of the Court of Appeals, "absolutely crucial to the question of appellants' guilt or innocence." It was unaccountably "lost", notwithstanding a rule of the Bureau of Narcotics and Dangerous Drugs, then in existence, that electronic surveillance tapes should be preserved for a period of 10 years. At the trial of the appellants, it was an undercover agent's highly incriminating testimony relating to a narcotics transaction in which he played a role that formed the crux of the Government's case against the appellants. But this Agent's testimony was based on very sketchy notes he made at the time, and a subsequently prepared report.

The Court of Appeals noted that the "lost" tape would have been more reliable than the undercover agent's recollection as evidence of what actually transpired in the motel room where the narcotics sale was made. Being confronted with the likelihood that the lost tape would never be found, the Court of Appeals was presented with the choice of dismissing the indictment or affirming the convictions. Before making this decision, the case was remanded to the District Court to "weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice."

On remand, the District Court credited testimony of the Agents of the Bureau who had played the tape and said they found it to be almost entirely unin-

---

12. The FBI policy since 1968 has been to preserve electronic surveillance tapes. Thus, the situation of which Ivanov complains will not occur again.

13. The defendants in Bryant were convicted of offenses involving the sale by them of a substantial quantity of heroin to an undercover agent of the Bureau of Narcotics and Dangerous Drugs. The sale was negotiated and concluded in a motel room. The conversations that went on in connection with the sale were overheard and electronically recorded on tape by other Agents of the Bureau who were stationed in an adjoining room. It is obvious, as stated by the Court of Appeals, that the "lost" tape "had major potential importance to the question of guilt or innocence, since it might have enabled appellants to contradict the testimony of the undercover agent involved in the narcotics transaction."

telligible. Based on this testimony, the District Court concluded that the tape would have been of little use to appellants. The case then went back to the Court of Appeals where the convictions were affirmed. United States v. Bryant, 145 U.S.App.D.C. 259, 448 F.2d 1182 (1971). In its affirmance opinion, the court noted that although "the degree of negligence shown was regrettably great, it is outweighed by other factors." It also stated that "under the more pragmatic balancing approach which we have adopted for these cases, the unintelligibility of the tapes—when combined with the very strong evidence of guilt adduced at trial—outweighs the negligence involved in the loss of the tape."

In contrast to Bryant, the daily logs of the Ivanov electronic surveillance have been made available to him. The tapes used in that investigation were erased or destroyed only after their transcription into logs. There was no rule then in existence which required that tapes be preserved for any specified period of time. There is no evidence that the logs did not accurately summarize what was recorded on the tapes. There is no evidence of bad faith by the Government. There is no evidence that any information obtained by means of electronic surveillances 4001–S* and 4002–S* resulted, directly or indirectly, in prejudice to Ivanov.

Where it is clear, as it is here, that the logs do not contain matter prejudicial to a defendant, the Government is entitled to prevail. United States v. Giordano, 440 F.2d 449 (6 Cir. 1971); United States v. Mirro, 435 F.2d 839 (7 Cir. 1970); United States v. Stassi, 431 F.2d 353 (5 Cir. 1970). It should be stressed that the lost or destroyed tape in Bryant bore directly on the defendants' guilt, as testified to by the Government's key witness. The tapes in Ivanov have no such significance. If the tapes involved in surveillances 4001–S* and 4002–S* contained any information

of investigative value, the tapes were to be preserved and submitted to Supervisor McWilliams. None were submitted because, in the judgment of the experienced monitoring Agents, nothing of value was overheard. Upon a consideration of the circumstances surrounding the non-preservation of the tapes here in question, the insignificance of the evidence lost by erasure, and the evidence of guilt adduced at Ivanov's trial, the conclusion is inescapable that Ivanov was in no way prejudiced by the challenged surveillances.

The delay in revealing the unlawful electronic surveillances in this case is claimed by Ivanov to be a violation of his right to a speedy trial under the Sixth Amendment.

▇ The Supreme Court, in Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970), has recently had occasion to consider the "Speedy Trial" provision of the Sixth Amendment. A fair reading of Dickey would support the proposition, the impact of which is determinative, that a defendant must show that actual prejudice in fact resulted from the delayed prosecution. Accord, United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

▇ Whether the Sixth Amendment right to a speedy trial is violated depends on all of the facts and circumstances of the particular case. United States ex rel. Bennett v. Rundle, 419 F.2d 599 (3 Cir. 1969). In this Circuit, four factors are considered in determining whether a violation of the right to a speedy trial has occurred: "the length of the delay; the reason for the delay; the prejudice to the defendant; and waiver by the defendant." Hunt v. United States, 456 F.2d 582 (3 Cir. 1972), filed February 7, 1972. See, also, United States v. Varga, 449 F.2d 1280 (3 Cir. 1971).

▇ This Court has found no evidence of taint resulting from the elec-

tronic surveillance of Ivanov. In the absence of a showing of any taint, it follows that Ivanov's rights have in no way been prejudiced by the fact that he did not have knowledge of and access to the logs prior to his trial. In this case not even the Assistant United States Attorney who prosecuted Ivanov knew of the existence of electronic surveillances. Absent a showing of taint or actual prejudice by the Government's failure to promptly disclose the electronic surveillances, Ivanov's claim of a Sixth Amendment speedy trial violation is not meritorious.

There is no basis or reason for granting Ivanov's request for another hearing to determine whether additional electronic surveillances of Ivanov were conducted of which he has not been apprised. There was some testimony by Supervisor McWilliams which indicated that he might be aware of technical surveillances of Ivanov other than 4001–S* and 4002–S*. However, as it was later established, what McWilliams had in mind were the surveillances turned over to the Court for an *in camera* examination and subsequently sealed. See note #3 of this Memorandum. The Court is satisfied that the only surveillances, in addition to 4001–S* and 4002–S*, are the three that were submitted to the Court *in camera*.

Upon a review of pertinent portions of the existing trial record in this case, and a careful consideration of all the evidence adduced at the taint hearing, this Court is satisfied beyond a reasonable doubt that, although electronic surveillances 4001–S* and 4002–S* were unlawful and violative of Ivanov's Fourth Amendment rights, Ivanov's conviction was not in any way tainted by the use of any evidence so obtained.

Under the circumstances, and for the reasons stated herein, a new final judgment of conviction will be entered with respect to Igor A. Ivanov, based on the existing record as supplemented by these further findings.